**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

-------------------------------------------------------------X

SUNIL HINGORANI,

                          Plaintiff,

                  v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA, THE
UNIVERSITY OF NEBRASKA, THE
UNIVERSITY OF NEBRASKA MEDICAL
CENTER, NEBRASKA MEDICINE, UNMC
PHYSICIANS, JEFFREY GOLD (in both his
individual and official capacities) and JOANN
SWEASY (in both her individual and official
capacities),

                         Defendants.

-------------------------------------------------------------X

:    Civil Action No.:

:    **COMPLAINT**

:    **Jury Trial Demanded**

Dr. Sunil Hingorani, as and for his Complaint against the Board of Regents of the University of Nebraska (the "BOR"), University of Nebraska ("UN"), University of Nebraska Medical Center ("UNMC") (the BOR, UN and UNMC, collectively, the "University Defendants"), Nebraska Medicine ("NM"), UNMC Physicians ("UNMCP") (the University Defendants, NM and UNMCP, collectively, the "Entity Defendants"), Dr. Jeffrey Gold (in both his individual and official capacities) and Dr. Joann Sweasy (in both her individual and official capacities), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      When the Nebraska Legislature voted to commit $15 million in public funds to help develop a Pancreatic Cancer Center of Excellence ("PCCE") at Nebraska University, it was

making a bet — on behalf of every Nebraskan — that the state could become a national leader in the fight against one of the most lethal cancers in the world.

2.      The legislation provided that the state would match up to $15 million in private philanthropic funds, and that the combined $30 million would be deployed — under the direction of a world-class physician-scientist — to build a program that would bring cutting-edge clinical care, landmark research, and life-extending clinical trials to the people of Nebraska.

3.      The Board of Regents of the University of Nebraska (the "BOR"), University of Nebraska College of Medicine (the "COM"), Nebraska Medicine ("NM"), University of Nebraska Medical Center ("UNMC") and Dr. Jeffrey Gold, among others, heavily recruited and ultimately hired Dr. Hingorani to lead the PCCE, as well as to direct a multidisciplinary clinic, the Pancreatic Diseases Specialty Clinic ("PDSC").

4.      With Dr. Hingorani's hiring, Defendants[1] were well positioned to accomplish the legislature's goals.

5.      Indeed, Dr. Hingorani is not merely an accomplished physician.  He is among the most credentialed, most published, and most clinically impactful pancreatic cancer researchers in the world.

6.      When Dr. Hingorani began to work for Defendants, he hit the ground running. On the back of his reputation and efforts, the National Pancreas Foundation ("NPF") recognized

---

[1]      When the term "Defendants" is used in describing events that occurred before Dr. Sweasy was named Director of the Fred & Pamela Buffett Cancer Center ("FPBCC") and the Eppley Institute for Research in Cancer and Allied Diseases (the "Eppley Institute") (approximately October 2023), the term refers to all Defendants except for Dr. Sweasy.  When the term "Defendants" is used in describing events that occurred after Dr. Sweasy was named Director of the FPBCC and Eppley Institute, the term refers to all Defendants.

UNMC as a dual Center of Excellence designation in both clinical care and scientific research, a recognition so rare it is held by only a handful of institutions in the world.

7.      Similarly, the Pancreatic Cancer Action Network ("PanCAN") — the leading national pancreatic cancer organization — designated UNMC a Precision Promise site for the first time in its history.

8.      Dr. Hingorani also revamped the University's ineptly run clinical trials office, and pharmaceutical companies that had refused to conduct clinical trials at UNMC for years began lobbying to be included.

9.      Dr. Hingorani made critical hires, developed various programs to advance the study and treatment of pancreatic cancer and advocated for and purchased state of the art equipment that was previously lacking.

10.      Unfortunately, however, as described herein, various other efforts, including to upgrade the Entity Defendants' antiquated information technology ("IT") and electronic medical records systems and market the PCCE, as well as to ensure that patients were and are receiving appropriate medical care and that the state funds pledged by the legislature are being used for permissible purposes, have been thwarted by Defendants through a series of breaches of Dr. Hingorani's contracts and other unlawful discriminatory and retaliatory acts.

11.      Chief among these unlawful acts was Defendants' decision to remove Dr. Hingorani from the PDSC. This discriminatory decision directly resulted in the hastened death of a pancreatic cancer patient due to medical malpractice that Defendants continue to try to hide from the family of the deceased. If that was not enough, it has been months since Dr. Hingorani reported this to Defendants and they have taken no remedial action despite Dr. Hingorani's repeated warning that this could happen again. Instead, Defendants have retaliated against Dr.

Hingorani for engaging in related protected activity, hoping to keep him quiet and sweep their misconduct under the rug.

12. As noted above, in addition to retaliation and breaches of contract, much of Defendants' unlawful conduct was and continues to be motivated by Dr. Sweasy's unlawful discriminatory animus towards Dr. Hingorani on account of his race, ethnicity and national origin.

13. To that end, Dr. Hingorani was one of six South East Asian mid- to senior-level scientists reporting to Dr. Sweasy during the relevant period, the others being Dr. Channabasavaiah Gurumurthy, Dr. Amar Natarajan, Dr. Prakash Radakrishnan, Dr. Apar Ganti and Dr. Hamid Band. Three (including Dr. Hingorani) have been demoted and removed from key positions. Dr. Sweasy has forced the other three out of UNMC completely.

14. Perhaps most disappointingly is the behavior of Dr. Gold, who is now the President of UN. Dr. Gold's own father died of pancreatic cancer – something he and Dr. Hingorani have in common – and Dr. Gold made appeals to and recruited Dr. Hingorani based on the promise that the University would do everything in its power to support Dr. Hingorani in a shared mission; namely, to discover the cure for pancreatic cancer.

15. When Dr. Hingorani made a personal plea to Dr. Gold to resolve the matters raised herein, Dr. Gold responded impersonally, through counsel, requesting instead that Dr. Hingorani propose the terms of his own resignation.

16. This lawsuit seeks to hold Defendants accountable for what they did (and are continuing to do) to Dr. Hingorani, for what they did (and are continuing to do) to their own patients, and for what they did (and are continuing to do) with the state funds and donor

4

contributions that were entrusted to them to advance the fight against one of the deadliest cancers in the world.

## JURISDICTION AND VENUE

17.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under § 1983. The Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

18.   Venue is proper in the District of Nebraska pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred here.

## PARTIES

19.   Plaintiff Sunil Hingorani is a resident of Nebraska and, at all relevant times, met the definition of an employee of Defendants under the relevant statutes and common law.

20.   The Board of Regents of the University of Nebraska is, pursuant to Neb Rev. Stat. § 85-105, a body corporate, vested with the general governance of the University of Nebraska.

21.   The University of Nebraska is a public institution of higher education.

22.   University of Nebraska Medical Center is an educational and research institution under the umbrella of the Board of Regents of the University of Nebraska. At all relevant times, UNMC met the definition of an employer of Plaintiff under the relevant statutes and common law.

23.   Nebraska Medicine is a 501(c)(3) non-profit healthcare system. NM was formed in 1997 when Clarkson Regional Health Services, Inc. ("Clarkson") merged with the UNMC (formerly University Hospital). From that point forward, NM was an organization with two members, each with 50% control over NM: (i) the Board of Regents of the University of Nebraska; and (ii) Clarkson. The BOR and Clarkson set up a Board to govern NM, which, in

5

turn, hired executives to run NM.  Earlier this year NM filed suit against the BOR and Clarkson in an effort to torpedo Clarkson's sale of its interest in NM to the BOR.  In response, the BOR and Clarkson promptly replaced almost the entirety of the NM Board and the suit was withdrawn.  NM continues to be controlled by UNMC and Clarkson, and the aforementioned sale is expected to be finalized in mid-2026.

24.     UNMC Physicians ("UNMCP") is a 501(c)(3) non-profit faculty practice group for UNMC that is integrated directly into NM.  At all relevant times, UNMCP met the definition of an employer of Plaintiff under the relevant statutes and common law.

25.     Dr. Jeffrey Gold is a resident of Nebraska, the President of the University of Nebraska and the former Chancellor of UNMC.

26.     Dr. Joann Sweasy is a resident of Nebraska, the Director of the Fred & Pamela Buffett Cancer Center and the Director of the Eppley Institute for Research in Cancer and Allied Diseases.

## FACTUAL BACKGROUND

### I.     DR. SUNIL HINGORANI

27.     Dr. Sunil R. Hingorani is one of the foremost authorities on pancreatic cancer in the world.  Over the course of a career spanning more than three decades, he has made foundational scientific discoveries, led landmark clinical trials, trained the next generation of oncologists and researchers, and built institutional programs that collectively have materially advanced the standard of care, comfort, and life span for patients with pancreatic cancer.

28.     Dr. Hingorani received his Bachelor of Science degree in Molecular Biophysics and Biochemistry, summa cum laude, from Yale College in 1985, graduating with membership in the Phi Beta Kappa Honor Society.

6

29.    He then completed a combined M.D./Ph.D. program at Yale University School of Medicine, earning both degrees in 1994 with high honors.

30.    His doctoral research was conducted in Cellular and Molecular Physiology through the Yale Graduate School of Arts and Sciences, supported by a Howard Hughes Pre-Doctoral Fellowship Award (1988–1993) and a Medical Scientist Training Program Award.

31.    Following medical school, Dr. Hingorani completed his internship and residency in Internal Medicine at the Brigham and Women's Hospital in Boston (1994–1997), one of the nation's premier academic medical centers affiliated with Harvard Medical School.

32.    He subsequently trained as a Clinical Fellow in Hematology and Oncology through the Dana-Farber/Partners Cancer Care Program (1997–2000) while simultaneously conducting post-doctoral research at the M.I.T. Center for Cancer Research (1998–2000).

33.    Dr. Hingorani's contributions span basic science, translational research, and clinical medicine — a combination that places him among an exceptionally small number of physician-scientists operating at the frontier of this field.

34.    Dr. Hingorani's laboratory work has produced discoveries that are now textbook staples of pancreatic cancer biology, including most notably the co-development of a specially engineered mouse that develops pancreatic cancer in the same way humans do, which is the standard tool used by hundreds of cancer laboratories around the world to test new treatments before they reach patients.  He also discovered previously unknown and misunderstood characteristics of pancreatic cancer that has changed the way the disease is studied and treated (including through now-baseline chemotherapy treatment regimens Dr. Hingorani helped to develop).

7

35.     In parallel with this research, Dr. Hingorani established himself as one of the world's leading physicians in treating pancreatic cancer, including through his work at the University of Pennsylvania Abramson Family Cancer Research Institute and Philadelphia Veterans' Administration Medical Center; Fred Hutchinson Cancer Center, Seattle Cancer Care Alliance and the University of Washington Medical Center; and, most recently, at UNMC and Nebraska Medicine.

36.     Dr. Hingorani is the author or co-author of more than 75 peer-reviewed publications, has authored six book chapters, has delivered more than 100 invited lectures at national and international conferences, universities, and cancer centers and has been called upon extensively to shape national research strategy and advise the most important institutions in the field, including through service on various advisory boards and panels.

37.     Prior to joining Defendants Dr. Hingorani also held faculty positions at the most prestigious institutions in the country, including the University of Pennsylvania and University of Washington School of Medicine.

38.     In short, Dr. Hingorani stands virtually alone at the very top tier of pancreatic cancer research and clinical medicine.

## II.     UNIVERSITY OF NEBRASKA HEAVILY RECRUITS DR. HINGORANI

39.     On June 28, 2018, the BOR, at the request of Susan Fritz, Executive Vice President and Provost of UN, approved the establishment of the Center of Excellence in Pancreatic Cancer.

40.     As described in UN's request, the mission of the PCCE is "to improve the health of patients diagnosed with pancreatic cancer," its vision is to "establish UNMC as a nationally-recognized center of excellence in care and research related to pancreatic cancer early detection,

genetic counseling, surgical techniques, chemotherapy, immunotherapies, pathway directed therapies, and radiation therapy" and its goal is to "bring together the physicians and scientists specializing in pancreatic cancer care and research while advancing the pancreatic cancer program throughout the region and nationally."

41.     Also as described in UN's request, at the time "no one UNMC department or college exist[ed] that ha[d] the faculty expertise to accomplish its goals" and there was need for "a visionary leader" to serve as the Director of the to-be-formed PCCE.

42.     Over two years later, in the Fall of 2020, Dr. Hingorani received several unsolicited outreach emails from Julie M. Vose, then the Division Director of Hematology and Oncology at UNMC.

43.     At the time, Dr. Hingorani had absolutely no interest in leaving his positions at the Fred Hutchinson Cancer Center and University of Washington, where he had developed an internationally recognized interdisciplinary clinic that served as a model for clinics across the country and world.  Accordingly, he did not respond to Dr. Vose's initial inquiries.

44.     UNMC, however, persisted. A few months after receiving the aforementioned emails, Dr. Hingorani received a call from Dr. Michael A. Hollingsworth, the Hugh & Jane Hunt Chair in Cancer Research at the UNMC Eppley Institute for Research in Cancer and Allied Diseases. Dr. Hollingsworth urged Dr. Hingorani to take UNMC's outreach seriously, and the recruitment process began in earnest.

45.     During the Spring of 2021, Dr. Hingorani had two lengthy Zoom meetings with interested stakeholders.  These were followed by two separate trips from Seattle to Omaha. Each trip lasted two to three days and involved lengthy substantive meetings with UNMC, the COM and NM personnel and leadership.

46.    During these meetings, Dr. Hingorani made explicitly clear, over and over again, that he was not particularly interested in leaving Seattle and would only do so if he believed that he could reach his end goal — finding a cure for pancreatic cancer — faster at UNMC than in Seattle.

47.    He knew that would be a difficult task. Just winding down, transferring, and starting up his lab again would set him back well over a year. The lab consisted of over 1,000 animals and hundreds of cages, along with countless equipment. It takes 4–6 months just to wind down the colony of mice required for research, and another 12 months minimum to breed until the colony is sufficiently large to resume meaningful research.

48.    As such, Dr. Hingorani insisted upon specific conditions before he would even consider moving.

49.    One such condition was complete discretion over whether and when he would treat patients (*i.e.*, clinical work). This was important because, on the one hand, clinical work was critical to Dr. Hingorani's career fulfillment and as a complement to his research work. On the other hand, Dr. Hingorani did not want his compensation tied to his time in the clinic such that his research would be hindered.

50.    A second condition was that his research would be very well funded and that he would not be the primary individual responsible for raising the funds (either by applying for federal grants or through private philanthropic efforts). In other words, he insisted not just on the ability to fundraise himself, but on a promise that substantial funds would be made available to him. This was of critical importance because scientists who are funded by National Institute of Health grants can spend up to 50% of their time writing grant applications. Dr. Hingorani

wanted to be able to spend as much time as possible doing research and clinical work as opposed to grant writing.

51.    Defendants gave Dr. Hingorani every assurance he asked for.

52.    Specifically, throughout the recruitment process, Dr. Hingorani was repeatedly assured by leaders from both UNMC and NM, including Dr. Gold, Dr. Vose, Dr. Ken Cowan (then the Director of the FPBCC), Dr. Debra Romberger (then the Chair of the UNMC Department of Internal Medicine), Dr. Bradley Britigan (Dean of the UNMC College of Medicine), Dr. Jim Linder (then the CEO of NM), and Dr. Jennifer Larsen (then UNMC's Vice Chancellor of Research), that given the unique history and partnerships involved in funding and establishing the PCCE (including private philanthropy and the Nebraska state legislature) and the close working partnerships among the institutions, there was uniform buy-in from all parties that the PCCE mission was of primary importance and that Dr. Hingorani's vision would be fully supported.

53.    Dr. Gold was personally instrumental in recruiting Dr. Hingorani.  In his first and primary interview with Dr. Hingorani, Dr. Gold made a point of stating that he had only one question: "Are you serious when you say you want to cure pancreatic cancer in your lifetime?" Dr. Gold emphasized that was all he cared about.  Dr. Hingorani unambiguously assured Dr. Gold that curing pancreatic cancer was his life's ambition.  In this interview, Dr. Gold also shared that he, like Dr. Hingorani, had lost his own father to pancreatic cancer, and he pledged to vigorously support Dr. Hingorani's goals and the PCCE's mission based on this shared motivation. Dr. Hingorani left that conversation believing he had found an institutional partner who understood, at the most human level, why the work mattered.

54.     Ultimately, Defendants offered Dr. Hingorani the position of the inaugural Nancy Armitage Presidential Chair and Director of the PCCE.

55.     On November 15, 2021, Dr. Hingorani was presented with an Offer Agreement. It explained, *inter alia*, "Your full time UNMC appointment will be a Health Professions contract as a member of the faculty in the University of Nebraska, College of Medicine," and it contained the following agreements and representations (among others):

- "You may see patients at your discretion, but you will not have formal clinical patient responsibilities."

- "[I]t is expected that your time devoted to clinical activities will consist primarily of helping to develop, launch, and guide the real-time multi-disciplinary clinic that will serve as a focal point for the PCCE and the translational research program as a whole."

- "This partnership will not only focus on outstanding clinical care in pancreatic cancer but significantly contribute to the division's education, research, and service missions, as well."

- "As Pancreatic Center of Excellence Director you will be expected to establish relationships across the department, UNMC and University of Nebraska partner institutions, Nebraska Medicine, and beyond, that will allow you to shape planned and future initiatives of the Center and division to enhance our national reputation and stature and move the science forward both in the lab and towards new strategies for patient care."

- $11,000,000 in "direct cost" "startup laboratory" (i.e., for Dr. Hingorani's own lab work) funding allocated over five years and sourced from the University of Nebraska Foundation, UNMC, NM, and proposed state legislation.

- $30,000,000 in "direct cost" funding, $15,000,000 of which would be sourced from proposed state legislation and an equal amount of which would be sourced from private philanthropy — for the purpose of building and directing the PCCE.

- Room for three (two junior and one senior) faculty recruits.

12

- "Initial salary as Pancreatic Cancer Center Director will be $450,000" (this increased to approximately $500,000 over the years).

- "Your program will be an essential partner with the Division of Hematology/Oncology, Department of Internal Medicine, UNMC, NM and the Buffett Cancer Center."

56. Critically, the Offer Agreement makes clear that the relevant organizations, including UN, UNMC, NM, and the COM, were and are not independent organizations with no responsibility, oversight, or obligations to each other and their respective relationships with Dr. Hingorani. They were partners, jointly accountable for delivering on the promises they had collectively made.

57. The Offer Agreement was signed by the entire senior leadership of UNMC, the COM, the Department of Internal Medicine, the Division of Hematology and Oncology and NM; specifically, Dr. Gold, Dr. Vose, Dr. Cowan, Dr. Romberger, Dr. Bradley Britigan, Dr. Linder, and Dr. Larsen.

58. The Offer Agreement was important not only because it memorialized the basic terms of Dr. Hingorani's future employment with Defendants, but also because Dr. Hingorani necessarily and reasonably relied upon it in agreeing to work for Defendants in the first place.

59. Indeed, the Offer Agreement was the only agreement upon which Dr. Hingorani could have based his decision to move his lab from Seattle to Omaha, as he could not become fully employed by Defendants until he became credentialed at NM.

60. Based on the promises and agreements in the Offer Letter, Dr. Hingorani embarked on what would ultimately be an eight-month transition process before he could even start to work with Defendants (and many more months to become fully up and running).

61.    Defendants, for their part, recognized what they had acquired and lost no time saying so publicly.  Six months before his scheduled arrival, UNMC's Communications Department issued a press release containing, *inter alia*, laudatory statements from Dr. Gold, Dr. Linder, Dr. Vose, Dr. Cowan, Dr. Larsen, Dr. James Armitage (Professor and widower of Nancy Armitage), and Dr. Theresa Franco (Vice President of Cancer Clinical Operations).

62.    Two months before he arrived, UNMC hosted a May 18, 2022 benefit and press conference during which Dr. Hingorani was seated in front of reporters alongside PGA Tour legend Gary Player.

63.    Finally, on July 28, 2022, more than four years after the PCCE Director position was approved by the Board of Regents, Dr. Hingorani commenced employment with Defendants.

64.    In addition to the Offer Agreement, three further agreements governed the terms of his employment:

- A January 2022 BOR/UNMC Agreement relating to Dr. Hingorani's employment as a UNMC, COM Faculty Member. The initial term of the BOR/UNMC Agreement ran from May 1, 2022 through June 30, 2023, and has been renewed on an annual basis such that the BOR/UNMC Agreement currently runs through June 30, 2027 and can only be terminated for "adequate cause, disability, bona fide discontinuance of the program or department to which [Dr. Hingorani] is assigned, or extraordinary circumstances because of financial exigencies."

- A January 2022 UNMC/COM Agreement setting forth compensation to be paid to Dr. Hingorani in addition to the compensation set forth in the BOR/UNMC Agreement.

- A March 2022 UNMCP Agreement relating to Dr. Hingorani's role in providing patient medical care (i.e., his clinical role). The initial term of the UNMCP Agreement ran through June 30, 2023, and was renewed on an annual basis such that the most recent UNMCP Agreement was set to run through June 30, 2027. The UNMCP Agreement permits either party to terminate it "Without Cause" upon 60 days' notice (or "For Cause" with no notice). UNMCP (by Chief Medical Officer Dr. Harris Frankel) and UNMC (through

14

then-Chair of the Internal Medicine Department, Dr. Romberger) signed the UNMCP Agreement. As described in detail below, the UNMCP Agreement was unlawfully terminated, without cause and in violation of various federal and state laws, effective March 24, 2026.

## III. DR. HINGORANI ARRIVES IN NEBRASKA AND ENJOYS IMMEDIATE SUCCESS

### A. The Multidisciplinary Clinic

65. Dr. Hingorani arrived at UNMC on July 28, 2022 and, notwithstanding the obstacles Defendants had already begun placing in his path, hit the ground running.

66. Among his primary mandates was to create and lead a multidisciplinary clinic for patients with pancreatic diseases. To understand why this was so important — and why Defendants' eventual sabotage of that clinic was so catastrophic — it is necessary to understand what was there before he arrived and what he built in its place.

67. The way in which most hospitals treat patients with pancreatic cancer is outdated and inefficient and results in poor outcomes in the form of shorter lifespans.

68. Individuals who end up being diagnosed with pancreatic cancer may first experience abdominal discomfort and see their primary care physician or a gastroenterologist. That typically results in a referral for radiologic study.

69. If the scans reveal a mass, there is typically another referral, this time to a surgeon and/or medical oncologist.

70. If the patient is referred to a surgeon, the scans are reviewed during the appointment (often for the first time), and often the scans need to be redone.

71. It is at that point that the patient would then be referred to a medical oncologist to determine whether chemotherapy should occur before or after surgery (if surgery is ever appropriate at all).

72.     This process, which does not even account for all of the other specialties one would and should see in these circumstances, typically takes many weeks or even months to complete — an unacceptable amount of time given that 25% of individuals diagnosed with pancreatic cancer die within two months.

73.     Dr. Hingorani's multidisciplinary model for the treatment of pancreatic cancer patients — one that he developed during his time in Seattle — eliminates these inefficiencies, emphasizes the interdependent and interdisciplinary nature of developing a comprehensive care plan, and gives patients a much better chance at a longer lifespan.

74.     Under Dr. Hingorani's model, all of the relevant specialties convene together to prepare a course of treatment over the course of one lengthy same-day meeting with the patient.

75.     The relevant scans are received, reviewed, and/or redone in short order, typically within 48 hours and prior to the interdisciplinary meeting so as to avoid any unnecessary delay.

76.     These meetings are attended by 40+ medical professionals, including radiologists, surgeons, medical oncologists, radiation oncologists, pathologists, gastroenterologists, nurses, physical therapists, symptom and pain management providers, nutritionists, etc., as well as residents and trainees from various departments.

77.     This attendance is critical not just for expeditious decision making, but also because they provide a forum for real-time, in-person discussion and debate among all providers, which, if the right people are in the room, should lead to better decision making and outcomes.

78.     Following the larger meeting, but still on the same day, the patient typically will meet with mini-teams of specialists who deliver the care plan.

79.     This multidisciplinary approach also allows all of the relevant medical professionals to see the patient's physical condition on the same day that decisions are made,

16

which is extremely important given that the physical condition of a pancreatic cancer patient can deteriorate significantly from one day to the next.

80. In short, under Dr. Hingorani's model as much can be accomplished in one day as might take up to several months in a traditional setting.

81. While Dr. Hingorani's model might now seem obvious, it was revolutionary when first implemented in Seattle some twenty years ago and is being replicated by hospitals across the country and world to improve the way they treat pancreatic cancer patients.

82. The development of the multidisciplinary clinic at NM immediately and substantially improved Defendants' development of comprehensive care plans for and treatment of pancreatic cancer patients.

83. This was due in no small part to Dr. Hingorani's leadership, as he was responsible for overseeing discourse, making sure it remained elevated, robust and civil; providing his expert perspective; and managing the egos in the room.

84. The transformation from a traditional to multidisciplinary model is not an easy one, particularly given the buy-in required from providers that are typically unaccustomed to working in a group setting. Without a well-respected leader like Dr. Hingorani, the model and improved patient care falls apart.

85. There is an entire national organization — the Canopy Cancer Collective — dedicated entirely to implementing Dr. Hingorani's multidisciplinary model at various hospitals and has done, or is doing, so at, *inter alia*, Johns Hopkins Medicine, Massachusetts General Hospital, Stanford Medicine, Roswell Park Cancer Institute, Northwell Health, Mount Sinai, Moffitt Cancer Center, UCLA Health, and the Cleveland Clinic.

86.    Dr. Hingorani's success in Nebraska was so immediate and comprehensive that the Canopy Cancer Collective quickly arranged an on-site visit to observe firsthand, and then invited Dr. Hingorani and the PDSC he developed to join the collective as a special "scout" site to more rapidly innovate and test new clinical approaches for potential wider dissemination.

**B.    Dr. Hingorani's Work with Respect to Clinical Trials**

87.    Dr. Hingorani inherited a Clinical Trials Office ("CTO") that was, for lack of a better term, a mess, and turned it into one of the best in the country.

88.    For context, when pharmaceutical companies have a new drug they want to test, elite clinical trial offices can ramp up in six months, and good clinical trial offices can ramp up in seven to nine months.  The ramp-up period at the FPBCC was over a year and, at times, as long as 15 months. As a result, the FPBCC was never going to get selected to run a clinical trial with respect to any drug with potential for medical or commercial success.  Meanwhile, the CTO was burning through $1mm per year without any hope of hosting a meaningful clinical trial.

89.    When Dr. Hingorani came in, he built a Clinical Research Unit ("CRU") for trials related specifically to pancreatic cancer treatments.  He hired data coordinators, research managers, trial nurses, and others, and ultimately achieved, in his first year, a ramp-up period that averaged three to four months, which, upon information and belief, is the fastest in the country.

90.    As a direct result of Dr. Hingorani's efforts, pharmaceutical companies now lobby UNMC to perform clinical trials.  Half a dozen leading clinical trials have been (or are being) performed at UNMC and more are being discussed.

18

C.      **National Recognition**

91.     One of the most important third-party organizations dealing with the treatment of pancreatic cancer patients is PanCAN.

92.     PanCAN is the (self-described) "leading organization dedicated to advancing progress against pancreatic cancer for patients today and in the future" and "only national pancreatic cancer organization to fight the disease on all fronts — through patient support, research, advocacy and community building."

93.     One of PanCAN's functions is research funding. Another is to support and connect patients with clinical trials.

94.     With respect to the latter, PanCAN launched "Precision Promise," which partners with a handful of select hospitals that are most adept at clinical research.

95.     The application process to be selected as a Precision Promise site is arduous, and Defendants' prior efforts to achieve such recognition were rejected.

96.     In January 2023, based primarily upon Dr. Hingorani's reputation and efforts, PanCAN recognized UNMC — and the CRU in particular — as a Precision Promise site.

97.     Two months later, in March 2023, UNMC was invited to join the Canopy Collective Learning Network.

98.     In the same month, UNMC was designated by the National Pancreas Foundation ("NPF") as a Center of Excellence in both Clinical Care and Scientific Research.

99.     Dual recognition is extremely rare and is a testament to Dr. Hingorani's research and clinical expertise and experience.

19

**D.     Additional Accomplishments**

100.    In October 2022, the PCCE sponsored and conducted an all-day Think Tank Symposium in Glen Arbor, New York, comprised of the 10 leading scientists in pancreatic cancer research in the country.

101.    In 2022 and 2023, the PCCE was the focal point for the Berenberg Gary Player Invitational Golf Tournament and Fundraiser, which, combined with the 2021 edition during which Dr. Hingorani's hire was promoted, raised over $2,000,000.  Dr. Hingorani was the featured gala speaker during the 2022 and 2023 events.  Dr. Hingorani has also raised an additional $1mm+ in new contributions since his arrival through personal meetings with, and presentations to, donors.

102.    Beyond fundraising, Dr. Hingorani achieved the following, among many other accomplishments:

- Staffed both the PDSC and the CRU with many critical hires and transfers, including two Bioinformaticists, a Clinical Program Coordinator, a Clinical Research Project Coordinator, Regulatory Coordinator, faculty members, specialty nurses, staff to write trials and perform feasibility studies, research coordinators, data managers, and technicians.

- Built a clinically-annotated Biospecimen Repository that has and will continue to support fundamental research and investigations into the basis for the elevated risk of pancreatic cancer for particular groups of peoples (Nebraskans, as one example).

- Assumed financial support of critical personnel overseeing the nationally-recognized Rapid Autopsy Program ("RAP"), which facilitates otherwise unfeasible research into the study of disease progression from the primary tumor to the development of metastatic capabilities.

- Assumed financial support of critical personnel managing UNMC's participation in a national consortium dedicated to early detection strategies for pancreatic cancer.

20

- Developed an interdisciplinary seminar series called "20/20/20 — Ideas into Action," to foster concrete and meaningful interactions between basic scientists and clinicians and spur the creation of novel, investigator-initiated clinical trials.

- Developed a Spatial Proteomics Hub consisting of state-of-the-art GeoMx and CosMx spatial profiling instruments and hired two dedicated research assistants to help run the instrumentation.

- Purchased a state-of-the-art Orbitrap Astral Mass Spectrometer to support early detection initiatives and address an urgent unmet need for Mass Spectrometer instrumentation at UNMC.

103.   In November 2022 — only four months into his tenure — in recognition of Dr. Hingorani's immediate and substantial success, Dr. Linder came to Dr. Hingorani's office and announced he had been sent on behalf of all of the senior leadership at UNMC and NM to ask if Dr. Hingorani would consider assuming the directorship of the FPBCC, as the former Director, Dr. Cowan, was preparing to step down.

104.   Dr. Hingorani thanked Dr. Linder, but explained that he was concerned that the administrative duties associated with overseeing the entire cancer center, including compiling the cancer center support grant for the NIH, might divide his energies and focus from the primary mission of the PCCE.

105.   In spring 2023, Dr. Cowan made additional appeals in two separate meetings with Dr. Hingorani to assume the FPBCC Directorship, but Dr. Hingorani again politely declined on each occasion.

## IV.   **DEFENDANTS' REFUSAL TO MARKET THE PCCE**

106.   Prior to Dr. Hingorani arriving at UNMC, he had been assured by the senior-most UNMC and NM leadership that a regional and national media campaign designed to showcase the PCCE would be one of NM's Marketing and Communications Department's ("Marketing Dept.") "highest priorities."

21

107. These assurances were of critical importance to Dr. Hingorani because marketing leads to patients and donations, which lead to revenues and sustainability, which lead to grants, etc., and the circle continues.

108. Shortly after he started, in October 2022, Frank Lococo, who was NM's Vice President for Marketing and Communications, told Dr. Hingorani that neither he nor anyone else was allowed to even refer to the PCCE as a "center of excellence" in any outward-facing marketing.

109. This is despite the fact that the PCCE was approved by the BOR and that UNMC had repeatedly referred to the PCCE as the "Pancreatic Cancer Center of Excellence" in various publications when it suited its needs. As to former point, Mr. Lococo outrageously claimed that "NM d[oes] not recognize the authority of the Board of Regents to designate centers of excellence."

110. Mr. Lococo's team explained that if he wanted to refer to the PCCE as a center of excellence, Dr. Hingorani would have to apply for a "clinical" "Center of Excellence" designation from the NPF. Ultimately, Dr. Hingorani not only applied for and received NPF's "clinical" "Center of Excellence" designation, but he also applied for and received NPF's "scientific research" "Center of Excellence" designation.

111. Despite having received the Center of Excellence designations, Dr. Hingorani continued to encounter resistance from Mr. Lococo's team.

112. Ultimately, in June 2023, at the direction of Dr. Linder, Dr. Hingorani met with Mr. Lococo and Dr. Frankel to discuss a comprehensive marketing campaign for the PCCE.

113. Dr. Hingorani shared the excellent news that the PCCE had now been designated as a center of excellence in both patient care and basic research by the NPF.

114. Inexplicably, Mr. Lococo dismissed the accolade that he himself had demanded Dr. Hingorani obtain, saying, "Everyone knows those things are just pay-to-play schemes."

115. Dr. Hingorani, frustrated, again laid out his detailed vision of the PCCE and hope for an extensive marketing campaign.

116. Mr. Lococo's response to Dr. Hingorani's presentation was to say, "Lots of people come here and say they're going to do great things, and nobody ever does."

117. When Dr. Hingorani asked Dr. Frankel — NM's Chief Medical Officer — whether he agreed with this astonishingly nihilistic message, he stayed silent.

118. Dr. Hingorani pleaded with Mr. Lococo and Dr. Frankel, and ultimately offered to find his own marketing professionals to do the work.

119. Though this was provisionally approved, Mr. Lococo and Dr. Frankel proceeded to try to kill every idea Dr. Hingorani's team developed, providing preposterous explanations for their behavior along the way.

120. By way of example, they attempted to prevent a billboard that said, "A New Way. A Better Way. The Nebraska Way," on the basis that the language constituted a "slogan." However, this "slogan" had previously been used in a variety of contexts, including at the aforementioned golf tournament. Moreover, Mr. Lococo also incredibly claimed that the "slogan" would have been okay if commas had been used between clauses, rather than periods.

121. Ultimately, Dr. Gold and Dr. Harris approved the billboard, but before it was erected Mr. Lococo threatened the manufacturer, saying that he would never again use it if it manufactured the billboard requested by Dr. Hingorani. Mr. Lococo then directed that the manufacturer create a significantly altered billboard that ended up being virtually unreadable and

of little advertising utility. Nevertheless, the altered billboard was erected.  It looked terrible, as even Dr. Gold agreed.

122.    To this day, no legitimate marketing campaign has been executed.

123.    This has created a series of issues, including the fact that even nearby medical practices have no idea that NM has (or at least had) a first-in-class pancreatic cancer clinic.

124.    By way of example, in October 2023, Dr. Hingorani learned that Midwest Gastrointestinal Associates, an Omaha-based medical practice, referred all of its pancreatic cancer patients to Methodist instead of NM.

125.    Dr. Hingorani learned that the reason was that MGI was under the mistaken impression that Methodist was the only local practice accredited for excellence in pancreatic cancer care.

126.    Dr. Hingorani reported this to Dr. Gold, lamenting the fact that Mr. Lococo was completely unwilling to advertise the dual Center of Excellence designation from the NPF.

127.    No remedial action was taken.

128.    As a result, patients who could have received life-extending treatment from Dr. Hingorani and the medical professionals at UNMC/NM, or participated in cutting-edge clinical trials, have never even learned about the opportunity to do so.

## V.    DR. HINGORANI'S EFFORTS TO BRING FUNCTIONING IT AND PATIENT RECORDKEEPING CAPABILITIES TO UNMC/NM ARE STYMIED

### A.    IT Security

129.    When Dr. Hingorani came to Nebraska, UNMC and NM's IT systems were in a state of disarray.

130.    Prior to Dr. Hingorani's arrival, there was a major breach of IT security when hackers gained access to NM's systems on August 27, 2020 and maintained access to its systems

and patient data for 24 days.  Upon information and belief, UNMC and NM ultimately paid millions of dollars in ransom to the hackers.  Upon information and belief, no one lost their job over this massive data breach.

131.    As a result of this, NM purported to "beef up" its IT security and the Entity Defendants put NM in charge of IT for the entire UNMC.  This was completely backwards and resulted in UNMC being at the mercy of NM when it came to IT issues.

132.    With its newfound power over IT, NM instituted a series of policies that made no sense and totally undermined UNMC's ability to collaborate with third parties or even to purchase equipment containing software (i.e., virtually every piece of equipment) without requiring the manufacturer of the equipment to fill out a detailed questionnaire and be subjected to in-person interviews and additional questioning.

133.    One of the most outrageous policies was one that prohibited UNMC's scientists from electronically receiving or transmitting large data sets to necessary third-party collaborators.  Instead, UNMC's scientists had to copy data onto physical thumb drives and mail the thumb drives, which obviously creates wild inefficiencies and is not nearly as secure as a secure electronic file transfer.

134.    NM also banned access to virtually every website, including ones that were necessary to access for a variety of important matters such as reviewing NIH grant applications.

135.    Thankfully, leveraging his connections, Dr. Hingorani arranged for Zscaler/Ridge13, among the world's most prominent cybersecurity firms, to test and provide a state-of-the-art system to enable large-scale data sharing and robust cybersecurity at UNMC. The Zscaler team also determined that the "upgrades" NM implemented to its systems after the breach of its patient electronic medical record system in 2020 did not, in fact, address the

problem and the system remains vulnerable to repeat sabotage.  The Zscaler team further informed NM IT that the Zscaler platform would provide state-of-the-art cybersecurity while decreasing personnel needs by approximately 40% and saving $1mm+ per year.

136.    In November 2023, after months of discussions, all parties agreed to begin a pilot test of the Zscaler platform. Four months later, in March 2024, the pilot test had not commenced because, among other roadblocks, NM's Chief Information and Technology Officer, Scott Raymond, refused to adhere to NM's agreement to commence work and flat out failed to respond to email after email on the topic. This was escalated to Dr. Gold on March 20, 2024. In April 2024, nine months after discussions began and four months after an agreement to begin work was reached, Mr. Raymond unilaterally declared, without explanation, that NM would not pursue the pilot test — hindering PCCE research, irreparably damaging Dr. Hingorani's reputation with this cybersecurity leader critical to his cutting-edge research, and leaving NM and UNMC in danger of another cyber attack.

137.    UNMC and NM's refusal to address their cybersecurity vulnerabilities had precisely the consequences that Dr. Hingorani and the Zscaler team had warned about.  In February 2026, UNMC learned that REDCap — a software application UNMC uses to support research studies, quality improvement projects, and public health activities — had a vulnerability that could allow an unauthorized person to gain remote access to the application.  Upon learning of the vulnerability, UNMC immediately took REDCap offline and initiated an investigation with the support of third-party cybersecurity consultants.  On February 18, 2026, UNMC's investigation determined that its instance of REDCap had been subject to unauthorized access between September 20, 2023 and February 3, 2026 — a period of more than two years of undetected intrusion.  Had Defendants accepted Zscaler's offer when Dr. Hingorani arranged it in

2023, this breach may never have occurred (or at least would have been discovered sooner). Instead, Defendants rejected the Zscaler solution, left their systems exposed, and presided over a second major cybersecurity failure — this one compromising research data across a period spanning the entirety of the Zscaler negotiations themselves.

### B.      Electronic Medical Records

138.    NM similarly thwarted Dr. Hingorani's effort to create a clinical tool that would allow any provider to see the care a PDSC patient has received across all providers.  This is a critical tool to ensure that accurate, efficient, and appropriate medical care is being provided.

139.    The Clinical Director for the PCCE, Christina Hoy, attempted to begin the process of getting this important clinical tool approved and created.  Ms. Hoy was sent in circles for six months until finally receiving an automated email that asked her to fill out pro forma paperwork and provide information that had already been provided many times over.

140.    Meanwhile, the technology that had been provided to the PDSC did not even provide an Ambulatory Referral Order function, which is a threshold function needed to refer patients to specialties.

141.    Two more months went by with no further response, at which point, on May 30, 2023, Dr. Hingorani sent a lengthy email summarizing the issue to Mr. Raymond and Michael Ash (then the Chief Operating Officer of NM).

142.    On June 3, 2023, Mr. Raymond sent Dr. Hingorani an email assuring him that both the clinical tool and referral order tool would be prioritized and that the buildout would get started.  However, in the same email, Mr. Raymond provided a slew of preposterous excuses for the delay to that point, and told Dr. Hingorani, "The request currently sits at #3 on the Oncology Management Committee's prioritization list, however they have three #1's so it is effectively

27

#5." Moreover, as pointed out the same day by Ms. Hoy, Mr. Raymond's email contained various inaccuracies and fundamentally misunderstood the ask.

143. Ultimately, as he attempted to do with respect to so many other problems created by NM, Dr. Hingorani tried to resolve this issue himself by identifying a leading electronic medical records company, Mediphore, which could develop advanced tools for the visualization of patients' data and clinical course throughout their pancreatic cancer care. Dr. Hingorani offered to have the PCCE pay for the cost.

144. In October 2023, Mediphore's Chief Executive Officer, Narayanan Krishnamurthy, Ph.D., met with then-Chancellor Gold to discuss the potential project and, with Chancellor Gold's encouragement, Dr. Krishnamurthy brought his team to UNMC to discuss the PCCE's needs directly with clinical personnel.

145. For seven months, NM's Office of the General Counsel threw up one logistical logjam after another and ignored months of emails about the terms of a Business Associates Agreement ("BAA").

146. As of May 2024, Mediphore had yet to receive authorization to even work on a proof-of-concept implementation. Dr. Krishnamurthy escalated these issues to Dr. Gold on May 15, 2024, and May 29, 2024.

147. The next day, Anna Cramer, NM's Chief Legal Officer, finally reached out to inform Dr. Krishnamurthy (after more than three months) that NM was somehow incapable of reviewing his proposed edits to the BAA because it was not in possession of a Statement of Work ("SOW"). However, Mediphore had provided as detailed a statement of work as possible and any further detail could only be provided after working to some degree with Dr. Hingorani, which could only occur once a BAA was executed.

28

148.   In other words, Ms. Cramer had made it impossible for Mediphore (or any other vendor, for that matter) to move forward.

149.   Accordingly, after months of fruitless discussions, Dr. Krishnamurthy abandoned the effort, explaining why in a lengthy letter to Chancellor Gold — once again damaging Dr. Hingorani's reputation with another leading technology provider and depriving NM and UNMC patients from improved medical facilities and care.

## VI.   DR. HINGORANI RAISES CONCERNS ABOUT EQUIPMENT, MAINTENANCE, FACILITIES, AND SELF-DEALING

### A.   Interference with the Purchase of a Mass Spectrometer

150.   Preeminent research centers generally have laboratories run by individual faculty investigators, as well as "core" facilities that are accessible to, and shared by, many investigators and departments.

151.   Given the importance of mass spectrometers to all areas of scientific research, high-functioning research centers will typically have a mass spectrometer facility with a machine, or machines, as well as trained full-time staff, that can be accessed by any scientist.

152.   UNMC had hardly any core shared facilities.

153.   Moreover, they had only one mass spectrometer, which was "owned" by one particular Principal Investigator.

154.   For a fee, this Principal Investigator would have his graduate students run samples for other UNMC scientists.

155.   Given the demand for the one mass spectrometer, as well as the cost, most scientists sent their samples out to other labs or cores at outside institutions.  These other facilities naturally prioritized their own in-house samples, which resulted in significant delays in analyzing samples provided by UNMC.

156. This delayed not just the research of UNMC scientists, but also significantly delayed or entirely prevented approval of grant applications.

157. By way of example only, after Dr. Hingorani joined UNMC, he learned that one of UNMC's researchers had identified a pancreatic cancer marker that appeared only in Black people, and not in white people. This scientist submitted an application for an NIH grant to support further research into his discovery, but due to the aforementioned delays was unable to provide the final pieces of data needed to secure the grant.

158. When Dr. Hingorani found out about this, he decided to purchase a mass spectrometer (using PCCE funds) and permit the researcher in question (and others) to use it as needed.

159. Incredibly, Dr. Sweasy and Dr. Bayles blocked the purchase of the mass spectrometer.

160. Their explanation for this decision was that if the PCCE had a mass spectrometer, it would "compete" with UNMC's core shared mass spectrometer facility. The problem with this reasoning was, among other things, that UNMC did not have a core shared mass spectrometer facility. The idea of the core shared facility was purely aspirational and to this day it has not been built.

161. Dr. Hingorani escalated the issue to Dr. Gold, who directed Dr. Bayles to permit the purchase.

162. However, even then, in defiance of Dr. Gold, Dr. Bayles again blocked the purchase. This time, he demanded that Dr. Hingorani agree to cede ownership and control of the mass spectrometer to the as-yet-to-built "revamped and upgraded" core facilities after one year.

163.    Dr. Hingorani was open to the idea of donating the mass spectrometer to a revamped core facility, but Dr. Bayles insisted on wresting control over that decision from the PCCE.

164.    Dr. Hingorani rejected this proposal for a variety of reasons, not the least of which was that it would have been completely inappropriate to use $1mm+ in PCCE funding (by then the cost of the equipment had increased by $200,000) to purchase a piece of equipment that would soon thereafter be handed over to a then-non-existent core facility without regard for whether the "revamped and upgraded" version of those core facilities was being competently operated.

165.    When Dr. Hingorani finally did get the mass spectrometer (using PCCE funds), Dr. Sweasy refused to pay to have it installed, and Dr. Hingorani ended up having to have the PCCE suffer the attendant delay and cover the cost of that as well.

166.    In addition to Dr. Bayles' conduct being in violation of Dr. Hingorani's contract, it also was in violation of the wishes of those who generously contributed to the PCCE, including the Young Family Foundation, who wrote that their donation was to be made available to the Director of the PCCE and that the Director was not to be interfered with in allocating the funds.

**B.    Other Facilities Issues and Conflicts of Interest**

167.    Like the IT systems, NM also inexplicably controlled facilities and maintenance on behalf of both itself and UNMC.

168.    The issues related to equipment, facilities and maintenance were not limited to large and expensive purchases.  By way of example only, it took facilities management 3 weeks to install a table, 3.5 weeks to install a water line connection for a necessary piece of equipment,

31

7 weeks to install an alarm in a freezer, and an incredible 88 days to dispose of a non-working refrigerator.

169.   Similarly, there were incredible delays in purchasing and installing vital equipment and software, including 50 days to purchase a microplate reader, a month to install a label maker, and a month to set up software for the laboratory's PCR machine.

170.   It also took months to purchase and set up for use a Vevo F2 machine, which was a piece of equipment that was necessary in order to conduct animal research.

171.   As of February 2024, more than a year-and-a-half after Dr. Hingorani started at Nebraska, his offices still had not been set up.

172.   The reasons for this were myriad, but all ultimately related to the complete ineptitude and corruption of NM's facilities management and finance teams.

173.   The Facilities Dept. imposed a 10% "management fee" on all infrastructure projects, incentivizing awarding contracts to the highest, rather than lowest, bids.  This fee, which was paid for out of philanthropic and grant monies designated for other purpose, was charged even where the Facilities Dept. was uninvolved in the project or purchase at issue.

174.   By way of example only, Dr. Hingorani learned of this arrangement when he attempted to purchase office furniture from an approved local business vendor and submitted the purchase order for payment.  Facilities Dept. personnel contacted the furniture business, demanded it cancel Dr. Hingorani's order, then reordered the same furniture for the same cost, but added the 10% "management fee."

175.   As another example, in early 2024, NM's facilities management team recommended that Kiewit Corporation ("Kiewit") be selected as the general contractor for a

construction project despite the fact that its estimate was for thousands of dollars more than the estimates provided by qualified alternatives.

176.   Kiewit had charged exorbitant amounts for other matters as well, including, in one instance, nearly $1,200 for less than an hour of manual labor.  In another instance, Dr. Hingorani identified a vendor that charged $250 for a task for which Kiewit tried to charge $1,600. As per its policy, NM budgeted for a 10% management fee — 10% of the higher bid from Kiewit — to be paid to its facilities team.

177.   On March 1, 2024, Dr. Hingorani's team pushed back and selected a lower-priced vendor.

178.   On March 5, 2024, Dr. Hingorani questioned why he was paying a management fee to the Facilities Dept. at all given that the team receives a salary and his NIH grants already come with sizeable funds (negotiated with UN) to cover indirect costs such as facilities and administrative costs associated with his research.  He received a conclusory response from Lindsey Neeman, a Facilities Planning Manager.  The response suggested that the entire facilities and management team is supported by the assessment of fees based on project cost — which creates a massive conflict of interest — and completely failed to address the fact that NIH grants provided separate funding for such indirect costs.

179.   Inexplicably, to this day, senior managers in NM's Facilities Dept. do not even know what "indirect costs" are, nor that they are to be used to support the infrastructure needs of investigators.  Anne Barnes, Senior VP and CFO for UN, has acknowledged this knowledge gap and the need for Facilities Dept. personnel to be educated on the matter.

180. On February 26, 2024, Dr. Hingorani sent another email, this time to Ms. Johnson (copying Dr. Gold, Ms. Bartholomew, Dr. Sweasy, Mr. Winfrey, and Ms. O'Malley), highlighting the Entity Defendants' failures relating to the provision of basic facilities and equipment.

181. This email referred specifically to the fact that Dr. Hingorani's laboratory still did not have a functioning downdraft table, which, as explained in the email, is "one of 3 absolutely fundamental core pieces of equipment [needed] for [Dr. Hingorani] to accomplish any of [his] science." At the end of the email, Dr. Hingorani asked (not for the first time) for permission to simply have the issue resolved himself.

182. On September 24, 2025, now more than three years after his arrival, Dr. Hingorani met with a Manager in the Facilities Dept. concerning various issues related to facilities and equipment. This manager felt compelled to share their experiences after hearing Dr. Hingorani report his concerns to the BOR (as described in further detail, below), and told Dr. Hingorani that the problems ran far deeper than he knew.

183. Among the concerns raised by Dr. Hingorani were those related to: (i) the frequent use of Kiewit Corporation despite the fact that its rates were among the highest of all construction firms used at Nebraska; (ii) FMP's own management fees and contingencies, which served to improperly inflate costs (and which were charged in full even when the overall cost of the project came in under budget); and (iii) the use of expensive external firms to perform work that could be performed in-house, quicker and at substantially reduced costs. All of this information was also provided to Dr. Gold as well.

184. Dr. Hingorani also reported that the Planning, Design and Construction ("PDC") team had been receiving kickbacks from external general contractors and engineering firms, including holiday gifts, golf outings, tailgating events, and happy hours.

185. These kickbacks were received in violation of UNMC's Vendor Interaction Policy and, of course, undermined any notion of objectivity with respect to bidding procedures and the disbursement of funds (including funds from grant monies, public funds and taxpayer dollars).

## VII.    DR. HINGORANI PRESENTS A PLAN FOR SUCCESS

186. Far from accepting these failures as inevitable, Dr. Hingorani spent the better part of two years attempting to work within the system to fix them.

187. He escalated through every available channel — individual emails, formal meetings with senior leadership, documented proposals, and presentations to the Board of Regents — and each time received assurances of reform that never materialized.

188. On February 28, 2023, Dr. Hingorani sent an email to Dr. Gold, Dr. Linder, and Dr. Cowan concerning many of the obstacles described herein.

189. This email led to a March 20, 2023 meeting between Dr. Hingorani, Dr. Gold, Dr. Linder, Dr. Cowan, and Dr. Bayles.

190. Despite reassuring statements from these leaders, nothing meaningful actually change

191. On July 7, 2023, after prior efforts to remediate many of the aforementioned problems failed, Dr. Hingorani sent Dr. Gold and Dr. Linder a document outlining many of the various challenges described above.

192. On July 10, 2023, Dr. Hingorani presented Dr. Gold and Dr. Linder with a 9-point plan for success.

193. Among other things, the plan proposed changes to the PCCE's reporting structure to pull it out from under the COM's and NM's multitiered and inefficient structure.

194.    It also proposed to allow the PCCE to handle certain functions in-house, including public relations and media, and to allow the PCCE to create its own secure IT system.

195.    The plan for success also asked leadership to reemphasize the importance of the PCCE and to prioritize its needs, permit the PCCE to hire critical positions without interference, and to rebuild the then-existing Clinical Trials Office.

196.    On July 22, 2023, Dr. Gold informally acknowledged his purported commitment to following through on the proposals made in Dr. Hingorani's plan for success, writing: "I believe that we agreed to operationalize each of these areas immediately, following your consideration on the proposed future steps. In many of these areas, we proposed innovative and precedent setting steps to a future where the science and the science alone will determine the outcomes. A science that we believe is in very capable hands. Most importantly, I hope that I have reaffirmed the UNMC/NM commitment to the future aspirational goals which we share and the willingness to continually revisit structures, policy, procedures, and much more to attain these goals."

197.    On September 26, 2023, Dr. Gold and Dr. Linder formally acknowledged Dr. Hingorani's efforts in a signed letter that read, in part: "The success that you have brought and the future that you envision is highly consistent with all that we have and resonates strongly with our legislative support, as well as the private philanthropic community, who all have the same passion based on much of the same strong motivating factors. In response to the necessary steps to bring this success to a reality, we strongly endorse the prominence of the Center, the necessary levels of streamlining processes and procedures that have in the past been delayed, and most importantly endorse your strong leadership of this Center of Excellence. The necessary administrative and structural changes that you have requested are actively underway and

certainly the recognition of your leadership in this area based upon continued demonstration of success across the entire spectrum of care and caring has been reinforced on many levels as well. Given the prominence of this program and given all of the experience and dedication that you bring, our confidence in you, in your leadership, in the science, and in the clinical care is unshaken and will lead us forward."

198. Meanwhile, on September 25, 2023, Dr. Hingorani (through the COO of the PCCE) sent a follow-up email about the difficulties with the Human Resources ("HR") processes at UNMC. The email explained that HR hurdles were negatively impacting the team's ability to hire the professionals needed to make strides towards finding a cure for pancreatic cancer. Dr. Gold promised to improve the processes and apologized on behalf of HR.

199. None of these issues were ever adequately resolved.

## VIII.   THE ENTITY DEFENDANTS MISAPPROPRIATE STATE FUNDS

200. The institutional obstruction the Entity Defendants directed at Dr. Hingorani's program was, in one critical respect, accompanied by something worse than obstruction: fraud.

201. From the outset, the Entity Defendants treated the $15 million in state matching funds — the public funds at the heart of the legislative commitment that helped bring Dr. Hingorani to Nebraska — as an institutional slush fund rather than a restricted grant.

202. To begin, the Entity Defendants disregarded the regulations relating to the $15mm in state matching funds.

203. At first, they demanded the $15mm from the state before actually collecting $15mm from private donors, which was a prerequisite for the state funding.

204. When the state informed the Entity Defendants that it would not release the funds based on uncollected pledges, the Entity Defendants scrambled to effectively steal $15mm

earmarked for other areas of the Entity Defendants' operations and put it into an account to show the state that it had "received" the $15mm in donations required for state funding.

205. As such, for nearly two years Dr. Hingorani was using funds from an indeterminate source for which there was no coherent accounting.

206. Upon information and belief, some or all of these funds were donations earmarked for other causes that the Entity Defendants impermissibly reallocated to trick the state into believing they had raised the requisite $15mm.

207. Based on these dishonest actions, the state did eventually release the $15mm in matching funds.

208. The Entity Defendants' misuse of those funds did not stop once they were received.

209. Effective July 1, 2024, Dr. Hingorani's appointment was transferred from UNMC's Department of Medicine to the Eppley Institute for Research in Cancer and Allied Diseases (the "Eppley Institute"). At that time, 51.80% of the portion of Dr. Hingorani's salary that was paid by UNMC began to be paid out of the state funds that were earmarked to support the PCCE. This was completely inappropriate and a misuse of the state funds, which were not provided for the purpose of paying the Director's salary.

210. Then, on April 30, 2025, the Entity Defendants started using funds from his endowed chair, the Nancy Armitage Pancreas Cancer Clinical Research Presidential Chair at the NU Foundation, to pay part of Dr. Hingorani's salary.

211. This was also completely inappropriate, as the interest earned on endowment monies are typically used to directly support the endowed chair-holder's laboratory research — not to pay his/her salary.

212. Dr. Hingorani repeatedly protested the misuse of these state funds, which generated significant retaliation, as described below.

213. Dr. Hingorani also pointed out that the authority to allocate PCCE funds was vested in him, and yet, in breach of his contract, he was not consulted about the decision to use the funds for this improper purpose.

214. These misappropriations were not administrative oversights. They were deliberate decisions, made over Dr. Hingorani's documented and repeated objections, that deprived the PCCE of the very resources Defendants had promised it — resources the State of Nebraska had committed fifteen million public dollars to provide

## IX.    THE AUGUST 2024 DEFAMATORY PROGRESS REPORT

215. In August 2024, Dr. Hingorani learned that Dr. Sweasy had met secretly with Dr. Bayles, among others, and drafted a report to the University Provost and Board of Regents claiming the PCCE had made little to no progress since its inception.

216. This report was false and defamatory, as the PCCE had been wildly successful to that point despite Defendants' best efforts to thwart Dr. Hingorani's progress.

217. Dr. Sweasy and VCR Bayles knew these allegations to be false.

218. Moreover, Dr. Hingorani was perplexed as to why the report had been drafted in the first place, as Dr. Gold himself had said that there was no specific due date for any progress report on the PCCE.

219. Dr. Hingorani escalated the issue to Dr. Gold and Dr. Davis S. Jackson, who was responsible for obtaining BOR approvals. Dr. Jackson explained that all he needed was a one-page summary of UNMC's review of the PCCE and, at the direction of Dr. Gold, the

39

Sweasy/Bayles report was discarded and Dr. Hingorani and Dr. Hollingsworth were tasked with drafting an accurate document.

220. Even after this document was drafted, portions of the defamatory Sweasy/Bayles document were appended to the final report provided to the BOR.

221. When Dr. Hingorani confronted Dr. Sweasy about why she had participated in this charade and not just come to him directly if she had any questions about the progress of the PCCE, she replied, for no specific reason, "Because you deserve it."

222. When Dr. Hingorani asked VCR Bayles why he was not informed of the PCCE review process, VCR Bayles replied: "There is no process. I made it up just for you."

## X.   DR. HINGORANI IS REMOVED FROM HIS CLINIC FOR PRETEXTUAL REASONS, RESULTING IN DIRECT HARM TO AND SHORTENED LIFESPAN FOR PATIENTS

223. On October 18, 2024, Dr. Sweasy and Kyle Skiermont, Vice President of Pharmacy and Therapeutics for Nebraska Medicine, requested to meet with Dr. Hingorani. They refused his repeated requests for an advanced agenda.

224. During this meeting, Dr. Sweasy and Mr. Skiermont ambushed Dr. Hingorani and told him that the clinical operations "team," including "providers, physicians, APPs, the nurses," and "staff" felt that Dr. Hingorani led the clinic "top down with little interest [in] input" and that "that their ideas are being stifled." They also said that "the team" claimed to have been "berate[d]" by Dr. Hingorani and that it was the "whole team [who] d[idn't] feel like they're being heard."

225. Neither Dr. Sweasy nor Mr. Skiermont was able to provide a single example.

40

226.    Dr. Sweasy and Mr. Skiermont forbid Dr. Hingorani from being present in the clinic if he did not have a scheduled appointment with one of his patients, and initially forbid Dr. Hingorani from participating in the PDSC multidisciplinary conferences described above.

227.    Dr. Hingorani attempted to explain repeatedly that his presence in the clinic was vital so that he could share his expertise and views regarding patient treatment decisions. He also attempted to explain repeatedly that the feedback he had received from his clinical colleagues was categorically different and very positive.

228.    Ultimately, Dr. Sweasy and Mr. Skiermont suggested that Dr. Hingorani could go to the meetings, but essentially directed him not to talk during them.

229.    Whatever "investigation" Dr. Sweasy and Mr. Skiermont performed before taking these adverse actions, if any, failed to conform to the minimal due process requirements of NM's Medical Staff Bylaws, Part II, Investigations, Corrective Actions, Hearing and Appeal Plan.

230.    There was no written request to the MEC to authorize the investigation and no formal resolution endorsing an investigation.

231.    There was no notice to Dr. Hingorani of the allegations or an opportunity for him to respond.

232.    There was no written report of findings and recommendations made to the MEC, and Dr. Hingorani is unaware of any referral of this matter to an internal peer review consultant, as the Medical Staff Bylaws recommend.

233.    Upon information and belief, to the extent that anyone actually even complained about Dr. Hingorani, the individuals were Dr. Reames and Ms. Hoy.

234.    Dr. Reames, a relatively new surgeon with few patient referrals, may harbor animus toward Dr. Hingorani because Dr. Hingorani declined Dr. Reames' request to

41

preferentially direct patients to him and determined that Dr. Reames had falsely accused a colleague of having deficient surgical skills in an apparent bid to have their patients instead referred to him.

235.    As for Ms. Hoy, she and Dr. Hingorani had a very collegial relationship for the first 18 months of working together.

236.    By way of example only, on June 6, 2023, Ms. Hoy sent Dr. Hingorani an email in which she blamed herself for causing Dr. Hingorani stress and aspired to be more like him.  Dr. Hingorani's response to this email, which is indicative of his leadership style, included, *inter alia*, "You are one of the brightest lights at this place and I absolutely love working with you. You do not need to work harder. What I need is a few more people like you and we will be able to build something spectacular and accomplish great things."

237.    In August 2023, Ms. Hoy delivered a handwritten card to Dr. Hingorani. In it, she wrote, *inter alia*, that it was "serendipity" that she "land[ed] on [Dr. Hingorani's] team." She went on to say that Dr. Hingorani is "fearless, brilliant, and always [her] biggest advocate . . . There is nothing else I would rather be doing and no one else I would rather be working alongside."

238.    Unfortunately, that cordial relationship changed after Dr. Hingorani pointed out Ms. Hoy's unprofessional behavior during a prolonged episode of shouting in a one-on-one meeting.

239.    The pretextual nature of the Sweasy/Skiermont investigation is confirmed by what the actual members of the clinical team said when anyone bothered to ask them.

240.    After the October 18, 2024 meeting, Dr. Hollingsworth spoke with over a dozen surgeons, medical oncologists, nurses, and researchers in the pancreatic cancer interdisciplinary

clinic. No one told Dr. Hollingsworth or Dr. Hingorani that he or she found Dr. Hingorani's leadership lacking in any way.

241.    In fact, they stated that they had never even been contacted by Dr. Sweasy for their input on Dr. Hingorani's leadership, despite the fact that she purported to speak on behalf of the "whole team" during the October 18, 2024 meeting.

242.    When asked for their feedback by Dr. Hollingsworth, all of those with whom he spoke were extremely laudatory. Some even wrote letters of support for Dr. Hingorani.

243.    As an example, when Monica Davis, RN BSN, and Kate Roth, RN, learned they were being reassigned from the PCCE to NM — allegedly because they did not want to work with Dr. Hingorani — Ms. Davis wrote to both Drs. Sweasy and Skiermont, *inter alia*:

> "Lastly, I would like to comment on my experience working with Dr. Hingorani whom I have great respect and appreciation. He has played a crucial role in bringing clinical trials to UNMC and has been a great resource in helping me understand pancreatic cancer. He has taken the time to discuss research findings with me and has helped me connect that knowledge to what I see in the clinic. I have also observed first-hand how wonderful he is with patients. He always explains complex concepts for patients and their family members in simple language to offer clarity and comfort and shows tremendous empathy while doing so. His empathy is evident in every patient interaction. He shows daily he values the role of nursing in patient care and has always treated me with kindness and respect."

244.    Notably, nearly six months later, the PCCE was still paying Ms. Roth's and Ms. Davis' salaries.

245.    Dr. Hingorani also received a letter of support from Dr. Quan P. Ly, and an email from Dr. Jean Grem confirming that Dr. Sweasy never spoke with her about the PDSC.

246.    Relatedly, in the spring of 2024, PCCE Chief Operating Officer Debbie O'Malley, a 15-year University of Nebraska veteran, felt compelled to resign from NM due to the various

issues described herein, and lauded Dr. Hingorani in her resignation letter: "It's been frustrating to work in a system that made forward progress so difficult, especially when we have an internationally recognized pancreatic cancer expert such as Dr. Hingorani who has not been able to focus on the science because of these distractions."

247. Also relevantly, on August 2, 2024 — only two months before he was largely banished from the clinic — Dr. Gold referred a patient directly to Dr. Hingorani, demonstrating his confidence in Dr. Hingorani's clinical skills.

248. In sum, the broader circumstances likewise make clear that no reasonable person in Defendants' position could have believed removal was warranted. Several faculty even made direct and unsolicited appeals to Dr. Gold and Interim Chancellor Davies to emphasize how valued and respected Dr. Hingorani was.

249. It is simply impossible that Dr. Sweasy and Mr. Skiermont, could have believed that they were removing Dr. Hingorani from the clinic for legitimate reasons.

250. On November 1, 2024, Dr. Hingorani met with Dr. Sweasy to discuss the feedback from his colleagues, the restrictions she had placed upon him, and the adverse impact it was having on the PCCE and patient care.

251. Dr. Sweasy was insistent that her directives would not change, claiming that she and Dr. Skiermont "were approached by a lot of people" and because they had "a situation on their hands" they "had to take action."

252. So, on November 18, 2024, Dr. Hingorani once again escalated these issues to Dr. Gold. This time, he wrote, *inter alia*:

> "At the end of this discussion, she just repeated once again her displeasure that I had attended clinic and the patient conference and then said she was going to go back to NM and make sure that I am not allowed to participate in the clinic any more. I have no idea what

44

is motivating this inexplicable behavior but it is clear that it is not at all about what is best for the program or for the patients of this state."

253.    On December 10, 2024, Dr. Hingorani received a letter from Dr. Frankel and Dr. Skiermont, in which they doubled down on the false allegations pertaining to "the challenging environment created under [Dr. Hingorani's] leadership."  The letter concluded, "you are not permitted to be present in the clinic except during the specific times of your patient visits," threatening "failure to adhere to these parameters may result in adverse action . . . up to and including termination of your employment."

254.    On August 26, 2025, Ms. Davis wrote a follow-up letter to Dr. Gold and Dr. Dele Davies, Interim Chancellor of UNMC. The letter explained: "I am writing to bring to your attention a matter of serious concern. It has come to my attention that false information is being circulated. Specifically, one statement alleges that Dr. Joann Sweasy met with all of the clinic staff, including the nursing team, and that the collective response was that we did not want Dr. Hingorani to be part of the Multidisciplinary Clinic. This statement is completely inaccurate and has the potential to harm not only professional reputations but also the trust and care we provide to our patients, as well as the integrity of our organization. I have never been approached by Dr. Joann Sweasy, nor by anyone from leadership regarding working with Dr. Sunil Hingorani. At no time has such a conversation taken place. . . . One of our core iTEACH values is accountability here at UNMC/Nebraska Medicine. I trust that leadership will take steps to investigate this matter, correct the false narrative, and reinforce our commitment to a respectful, factual, and transparent workplace."

## XI.  DEFENDANTS COMMIT MALPRACTICE AND SHORTEN THE LIFE OF A PATIENT AFTER DR. HINGORANI IS REMOVED FROM THE CLINIC

255.    As a result of Dr. Hingorani's removal from the clinic, he was no longer permitted to participate in the multidisciplinary meetings with colleagues and patients during which treatment decisions were made.

256.    This resulted in decisions that constitute malpractice, including in one instance the decision to conduct a surgery that resulted in a patient's expedited death.

257.    Specifically, after Dr. Hingorani was removed from the clinic, a multidisciplinary meeting was held with respect to a pancreatic cancer patient who had lesions in the liver.

258.    The only proper thing to do under the circumstances was to perform a biopsy to confirm whether the lesions were cancerous.

259.    This would indicate metastatic cancer, which, in turn, would make surgery inappropriate because, *inter alia*, the trauma to the body attendant to surgery would expedite the patient's eventual death while not at all addressing the patient's metastatic disease burden.

260.    Rather, to prolong the patient's life, the appropriate course of treatment is prompt chemotherapy.

261.    Both the radiologist and the medical oncologist present for the team review of this patient's records counseled in favor of biopsy and against surgery.

262.    Had Dr. Hingorani been present (i.e., had he not been unlawfully removed from the clinic), he would have prevented any contrary course of action.

263.    But he was not, and the transplant surgeon decided to perform a Whipple procedure.

264.    Sadly and unsurprisingly, the patient died soon thereafter.

265. Chemotherapy was never given a chance to help prolong his life, as the delay in its administration led to his death after only one round of chemotherapy.

266. The expected survival of the patient with the appropriate management would have been one year or longer.

267. To make matters worse, Defendants have hidden this catastrophic mistake from the now-deceased patient's family.

268. The family of the patient at issue has recently been asking questions of people involved in this patient's treatment — specifically, why it was that the patient was operated upon and why he died so quickly.

269. The family was told neither that the patient had metastatic cancer nor that he should not have been operated upon, and their questions have gone unanswered.

270. Dr. Hingorani has disclosed all of this information to Defendants. He even disclosed to Defendants that another inappropriate and life-shortening procedure was going to take place. Defendants have taken no steps to right the wrongs that have occurred or to prevent additional patient deaths.

## XII. NM TERMINATES DR. HINGORANI IN RETALIATION FOR PROTECTED ACTIVITY

271. Throughout this period, Dr. Hingorani had been doing precisely what a good-faith employee — and a responsible physician — is supposed to do. He reported financial irregularities, patient safety failures, kickback schemes, and state fund misappropriation through every available channel. Each escalation was met with the same sequence: an expression of concern, a promise of action, and no follow-through. Until the escalations became too loud to ignore — at which point Defendants responded not with remediation, but with retaliation.

272.    On February 10, 2025, Dr. Hingorani sent a letter to Dr. Gold in which he summarized and complained about the issues described herein. The letter concluded by informing Dr. Gold that Dr. Hingorani would "explore all other remedies available" (*e.g.*, litigation) if Defendants did not commit to an independent investigation of the issues.

273.    On March 6, 2025, Dr. Hingorani (through counsel) sent a letter to UN's General Counsel, Bren Chambers, and NM's Chief Legal Officer, Ms. Cramer.  The March 6, 2025 letter addressed Dr. Hingorani's removal from the clinic and Defendants' breaches of contract, among other things. It also stated, *inter alia*, "Most significantly, the limitation on Dr. Hingorani's access to the clinic directly has impacted the quality of patient care . . . As just one very recent example, Dr. Hingorani attended clinic to care for a patient referred by Senator Mark Kolterman and became aware that the patient had not been accurately staged and, consequently, the proposed care plan was inappropriate. As a result of this chance encounter, the patient is now receiving optimal care and has a dramatically improved prognosis."

274.    On May 23, 2025, Dr. Hingorani (through his counsel) sent a draft lawsuit to UN's General Counsel, Bren Chambers, and NM's Chief Legal Officer, Ms. Cramer. The draft contained allegations related to the manipulation of funds designed to mislead the state into believing that it had raised the $15mm required to receive state matching funds. It also contained allegations related to Defendants' impermissible use of state funds to pay Dr. Hingorani's salary (as opposed to funding the operation of the PCCE, for which the funds were earmarked), as well as the salaries of two nurses, even though NM had insisted on assuming administrative and financial control over these nurses.  The draft complaint also contained allegations related to the 10% facilities management fee discussed above.

275.    On May 30, 2025, Dr. Hingorani forwarded the draft complaint to Dr. Gold to ensure that he was on notice of the potential for litigation.

276.    On August 7, 2025, Dr. Hingorani sent a draft lawsuit to BOR member Tim Clare. The draft complaint contained allegations related to the manipulation of funds designed to mislead the state into believing that it had raised the $15mm required to receive state matching funds, Defendants' impermissible use of state funds to pay Dr. Hingorani's salary, and the 10% facilities management fee discussed above.

277.    On August 14, 2025, Dr. Hingorani brought the issues of the Facilities Dept.'s questionable practices to the attention of the Board of Regents at a public meeting. Specifically, he spoke about the following: (i) diverting state funds to pay salaries that should be paid by UNMC and NM — first without his knowledge and then over his objections even though he is contractually designated as the primary signatory for these funds; (ii) repeatedly blocking, for no identifiable reason, the purchase of state-of-the-art technologies in Mass Spectrometry and Spatial Informatics that are essential to any efforts in Early Detection and Novel Therapeutics despite the PCCE having ample funds, compelling reasons, and promised autonomy to make such purchases; (iii) erecting endless administrative barriers to importing the latest state-of-the-art technologies to plug serious deficiencies in cybersecurity and in the management and analysis of patient data, such that leading companies and CEOs now refuse to work with UNMC; (iv) the Facilities Management Department awarding contracts to the highest bidders — sometimes as much as 500% over the most competitive bid — presumably to maximize the 10% management fee they collect from every job; (v) refusal by NM's Marketing and Communications Department to advertise the PDSC, and among other things, their position that they do not recognize the

authority of the Board of Regents to even designate Centers of Excellence; and (vi) threats the quality of patient care.

278. Dr. Hingorani is unaware of any investigation or other action taken in response to his report to the BOR.

279. On December 2, 2025, Dr. Hingorani's counsel sent a letter to counsel for UN stating, among other things, that Dr. Sweasy "restricted Dr. Hingorani's access to the clinic without regard to the adverse consequences of denying patients care by one of the country's foremost pancreatic care clinicians and impeded Dr. Hingorani's access to equipment critical to his work," and that UNMC and NM "retaliated against Dr. Hingorani after he raised questions about the competency of the Information Technology Department, the Facilities Management/Building Department's apparent kickback schemes, the Finance Department's manipulation of State funds." The letter also raised the specter of litigation, and specifically, *inter alia*, "whistleblower, retaliation and other causes of action."

280. On December 4, 2025, Dr. Hingorani forwarded the December 2, 2025 letter to Dr. Gold and asked to meet with him in an effort to resolve the issues raised therein.

281. On December 17, 2025, Dr. Gold (through counsel) rejected Dr. Hingorani's invitation to speak and, in the same correspondence, requested that Dr. Hingorani propose terms of a resignation. This was in direct response to the conveyance of the draft complaints and other protected activities described herein.

282. Defendants' response to all of these protected disclosures was not investigation. It was termination.

283. On January 15, 2026, Dr. Hingorani (through counsel) reported in a letter to Mr. Chambers that Dr. Hingorani's removal from the clinic had resulted in improper and dangerous

medical care: "Removing him from his clinical duties whether at the direction of Sweasy or Nebraska Medicine has very real consequences for patient care. Just recently, a UNMC surgeon performed a Whipple procedure on a patient with metastatic pancreatic cancer, which contravenes virtually all respected advice. Dr. Hingorani was not part of the consult in the case. At worst, this surgery may constitute malpractice." The January 15, 2026 letter also reiterated the intent to initiate litigation with respect to all of the aforementioned facts and claims.

284. Only eight days later, on January 23, 2026, in a blatant act of retaliation, NM unlawfully terminated the UNMCP Agreement, "without cause," effective March 24, 2026. The timing was not a coincidence. It was a message.

285. On February 24, 2026, Dr. Hingorani, through counsel, put Defendants on notice of his intent to move forward with litigation "for whistleblower retaliation in violation of Nebraska Code § 48-1114, et seq., wrongful termination in violation of public policy, race discrimination in violation of 42 U.S.C. § 1981 and Nebraska Code § 48-1114, et seq., national origin discrimination in violation of Nebraska Code § 48-1114, et seq., breach of contract and breach of the covenant of good faith and fair dealing."

286. On March 23, 2026, Dr. Hingorani (through counsel) reported to Defendants (through correspondence to Mr. Chambers) further details about the improper Whipple procedure described above, and put Defendants on notice of the soon-to-be-performed improper surgery described above. Mr. Chambers conveyed that he would pass along the message to NM's general counsel, yet nothing has been done.

287. Despite his termination from UNMCP, Dr. Hingorani is still entitled to his full compensation pursuant to his Offer Letter. Yet, since March 24, 2026, Defendants have refused

to pay Dr. Hingorani his full compensation. This refusal is yet another act of retaliation that would never have occurred but for Dr. Hingorani's engagement in protected activity.

288. Even as Defendants worked to end his career at UNMC, Dr. Hingorani's peers continued to recognize him in ways that completely undermine Defendants' position.

289. On March 9, 2026, Dr. Hingorani learned that he had been nominated by his clinical colleagues and selected as the 2026 winner of the Dr. Martin Luther King Jr. Unsung Hero Award in the category of Leader.

290. Dr. Hingorani received the award on March 13, 2026, during a ceremony that was attended by over 30 members of his extended team, including several faculty from the Eppley Institute. During the award ceremony, Dr. Hingorani was invited up to the dais with the following introduction: "Dr. Hingorani's leadership has transformed pancreatic cancer care through innovation, collaboration and profound compassion. By building systems that prioritize patients as people and not numbers, and by mentoring teams with humility and purpose, he ensures that even in the hardest journeys patients and staff feel seen, supported, and valued. Congratulations Dr. Hingorani on receiving our 2026 Physician Leader Unsung Hero Award."

## XIII. DR. SWEASY'S TREATMENT OF DR. HINGORANI IS MOTIVATED BY <u>RACE AND NATIONAL ORIGIN DISCRIMINATION</u>

291. The conduct described herein — the fabricated progress report, the pretextual removal from the clinic, the systematic obstruction — did not occur in a vacuum. Dr. Sweasy's targeting of Dr. Hingorani was, in substantial part, motivated by race and national origin discrimination. And she had a pattern of acting on that motivation.

292. Dr. Sweasy's baseless actions against Dr. Hingorani also were motivated by race and national origin discrimination. Dr. Hingorani was one of six mid- to senior-level scientists of

52

East Asian national origin reporting to Dr. Sweasy.  He is the only one who remains in a leadership position at UNMC.

293.    Channabasavaiah Gurumurthy was a professor of East Asian descent and Director of the Mouse Genome Engineering Core Facility at UNMC. In those roles, Dr. Gurumurthy developed genome-editing technologies and custom mouse models useful for various biomedical research fields. Both Dr. Bayles and Dr. Sweasy treated Dr. Gurumurthy with disrespect and condescension. He was ultimately terminated in 2025.

294.    Amar Natarajan was another professor and scientist of East Asian descent who was mistreated and eventually forced out of UNMC by Dr. Sweasy in 2025, after 16 years of working for Defendants.

295.    Prakash Radakrishnan, another scientist of East Asian descent, had just won an NIH grant for pancreatic cancer research, and was unanimously supported for a promotion to full professor by the relevant promotion committee, when Dr. Sweasy unilaterally blocked his promotion and forced him out of Nebraska.

296.    Dr. Hamid Band, the senior most southeast Asian scientist in the FPBCC, was also pushed out of an active leadership role and into an emeritus position by Dr. Sweasy.

297.    Likewise, Dr. Sweasy forced Dr. Apar Ganti, the long-standing Associate Director for Clinical Research at FPBCC and the Co-Director of the Clinical Trials Office, to resign from these positions.

298.    The pattern is not coincidental — and it did not escape Dr. Hingorani's notice that the same methods deployed against Dr. Gurumurthy, Dr. Natarajan, and Dr. Radakrishnan — ostracism, manufactured process failures, blocked advancement — have been deployed against him as well.

53

**FIRST CAUSE OF ACTION: RACE DISCRIMINATION
IN VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF RIGHTS SECURED BY 42 U.S.C.
§ 1981 and THE EQUAL PROTECTION CLAUSE)
Against Dr. Sweasy in Her Individual Capacity**

299.    Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

300.    At all times relevant herein, Dr. Sweasy acted under the color of state law within the meaning of 42 U.S.C. § 1983.

301.    Plaintiff is a member of a protected class (race, ethnicity, national origin), including being of East Asian descent.

302.    42 U.S.C. § 1981 guarantees all persons the same right "to make and enforce contracts" as is enjoyed by white citizens, including the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  42 U.S.C. § 1981(a), (b).  Those rights are protected against impairment under color of state law. 42 U.S.C. § 1981(c).

303.    Through the acts and omissions alleged in this Complaint, Dr. Sweasy intentionally discriminated against Plaintiff because of his race in the making, performance, modification, and/or termination of Plaintiff's contractual relationships and in the enjoyment of the benefits, privileges, terms, and conditions of those contractual relationships, including but not limited to, by: (i) undermining Plaintiff's leadership role and authority; (ii) obstructing and diverting resources and funding promised for Plaintiff's program; (iii) excluding Plaintiff from clinical leadership functions and restricting clinic participation; (iv) subjecting Plaintiff to pretextual and irregular "processes" and investigations; (v) disseminating or relying upon false narratives regarding Plaintiff's performance and progress; and (vi) taking actions culminating in

54

the termination of Plaintiff's clinical agreement and other adverse changes to the terms and conditions of Plaintiff's employment and contractual relationships.

304.   Dr. Sweasy's conduct also deprived Plaintiff of equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

305.   Dr. Sweasy's discriminatory actions were intentional and were a moving force behind the deprivation of Plaintiff's federally secured rights.

306.   As a direct and proximate result of this unlawful conduct, Plaintiff has suffered damages, including but not limited to lost compensation and benefits, loss of contractual and professional opportunities, reputational harm, emotional distress, and other consequential damages, in an amount to be proven at trial.

307.   Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

308.   Plaintiff also seeks prospective injunctive and declaratory relief to remedy ongoing violations of federal law, including reinstatement and/or orders prohibiting further discriminatory practices, as applicable.

309.   Plaintiff also is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION: RETALIATION IN VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF RIGHTS SECURED BY 42 U.S.C. § 1981 and THE EQUAL PROTECTION CLAUSE) Against Dr. Gold and Dr. Sweasy in Their Individual Capacities**

310.   Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

311.   At all times relevant herein, Dr. Gold and Dr. Sweasy acted under the color of state law within the meaning of 42 U.S.C. § 1983.

312.    Plaintiff engaged in protected activity by, *inter alia*, opposing race discrimination, reporting discriminatory conduct and patterns targeting East Asian scientists, and asserting his contractual and economic rights to make and enforce contracts and to the benefits of his employment and endowed/director funds without racial discrimination, as secured by 42 U.S.C. § 1981 and the Equal Protection Clause.

313.    Dr. Gold and Dr. Sweasy retaliated against Plaintiff in violation of 42 U.S.C. § 1981 by, among other retaliatory acts, terminating Plaintiff's employment with NM and UNMCP and interfering with Plaintiff's compensation and economic benefits, including refusing to pay full compensation starting in March 2026.

314.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered damages, including but not limited to lost compensation and benefits, loss of contractual and professional opportunities, reputational harm, emotional distress, and other consequential damages, in an amount to be proven at trial.

315.    Plaintiff is entitled to all relief available under 42 U.S.C. § 1983, including compensatory damages, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

316.    Plaintiff also seeks prospective injunctive and declaratory relief to remedy ongoing violations of federal law, including reinstatement and/or orders prohibiting further discriminatory practices, as applicable.

317.    Plaintiff also is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION: RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF RIGHTS SECURED BY 42 U.S.C. § 1981 and THE EQUAL PROTECTION CLAUSE)**
**Against the University Defendants**

318.    Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

56

319. At all relevant times, the University Defendants operated UN, UNMC and NM, and exercised authority over UNMC leadership, departments, and programs.

320. The University Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

321. 42 U.S.C. § 1983 imposes liability on a municipal or local governmental entity that, through an official policy, widespread custom or practice, failure to train/supervise/discipline, and/or ratification by a final policymaker, causes the deprivation of constitutional or federal statutory rights.

322. The rights at issue include Plaintiff's right to be free from race discrimination and retaliation under the Equal Protection Clause of the Fourteenth Amendment, and the right to make and enforce contracts free from race discrimination and retaliation as secured by 42 U.S.C. § 1981 and enforceable via § 1983.

323. The University Defendants are "persons" within the meaning of § 1983 to the extent permitted by law, and is subject to suit for damages and appropriate equitable relief.

324. As described herein, Plaintiff was subjected to intentional discrimination based on race/ethnicity/national origin and retaliation for protected complaints about discrimination and unlawful practices, including clinic access restrictions, discipline and exclusion from clinical leadership without due process, adverse contract and compensation actions, interference with research/program funding and operations, and termination from clinical duties, among others. These actions impaired Plaintiff's employment and contracting relationship and were taken because of race and in retaliation for protected activity, violating the Equal Protection Clause and § 1981 (enforced via § 1983).

325.    The University Defendants maintained and applied official policies and directives, and issued leadership-level decisions with the force of policy, that caused the above violations. In particular, among other things: (i) leadership adopted, circulated, and used an official "progress" narrative concerning the PCCE in materials prepared for or appended to Board of Regents submissions, despite internal direction acknowledging its falsity, to justify adverse actions against Plaintiff; (ii) leadership secretly drafted a false progress report in August 2024 claiming the PCCE had made little to no progress, and even after Dr. Gold directed that the fabricated report be discarded, portions of it were appended to the document submitted to the Board of Regents; (iii) leadership decisions directed and enforced clinic access restrictions and discipline outside of established bylaws and processes, functioning as official policy; (iv) without adherence to Medical Staff Bylaws' investigative procedure, leadership directed and enforced Plaintiff's ban from the PDSC, directed and enforced Plaintiff not to speak in multidisciplinary conferences and restricted Plaintiff from being present in the clinic except during specific patient visits; and (v) leadership decisions directed and enforced Plaintiff's termination from NM and UNMCP.

326.    In the alternative, the violations were caused by widespread, well-settled customs and practices so permanent and well known as to have the force of law, including, among other things, a pattern of adverse treatment of East Asian scientists under the same leadership chain, evidencing discriminatory custom.

327.    In the alternative, the University Defendants' deliberate indifference in failing to train, supervise, and discipline leadership and departments with respect to anti-discrimination, anti-retaliation, clinical-discipline processes and termination decisions caused the violations complained of here.  Specific deficiencies included, among others: (i) failure to train/supervise

leadership to refrain from fabricating or appending false performance materials in Board submissions regarding Plaintiff's program; (ii) failure to train/supervise on clinic discipline processes, resulting in bans and restrictions imposed outside bylaws and without notice, investigation, or hearing; (iii) Failure to train/supervise on lawful termination decisions.

328. Ratification by a final policymaker. In the alternative, final policymakers, including Dr. Gold and the members of the BOR, ratified the unconstitutional and unlawful conduct by making the decisions complained of herein and refusing to rectify the unlawful conduct described herein after learning about it.

329. The University Defendants' policies, customs, failures to train/supervise/discipline, and ratification were the moving force behind the deprivation of Plaintiff's rights.

330. As a direct and proximate result, Plaintiff suffered economic losses (including lost compensation and research/program funds), reputational harm, loss of professional opportunities, emotional distress, and other consequential damages, and continues to face ongoing and imminent irreparable harm absent injunctive relief.

331. Plaintiff seeks: (i) a declaration that the University Defendants' policies, customs, failures to train/supervise/discipline, and ratification caused violations of the Equal Protection Clause and § 1981 rights enforceable via § 1983; (ii) preliminary and permanent injunctive relief prohibiting further discrimination and retaliation; reinstatement; restoring Plaintiff's access to and participation in the PDSC and related clinical leadership and conferences subject to lawful processes; requiring removal of false or misleading materials from BOR submissions and institutional files; and requiring compliant policies, training, supervision, and discipline regarding anti-discrimination/retaliation, clinic discipline processes, integrity of BOR materials,

59

and use of earmarked funds; (iii) Compensatory damages in an amount to be determined at trial, to the extent legally available; (iv) Punitive damages to the extent legally available and not barred against the entity; (v) Attorneys' fees and costs under 42 U.S.C. § 1988; and (vi) Such other relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION: RACE DISCRIMINATION
IN VIOLATION OF 42 U.S.C. § 1981**
**Against Nebraska Medicine, UNMCP and Dr. Sweasy**

332.   Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

333.   Through the acts and omissions alleged in this Complaint, NM, UNMCP and Dr. Sweasy intentionally discriminated against Plaintiff because of his race, ethnicity and national origin by, among other things: (i) undermining Plaintiff's leadership role and authority; (ii) obstructing and diverting resources and funding promised for Plaintiff's program; (iii) excluding Plaintiff from clinical leadership functions and restricting clinic participation; (iv) subjecting Plaintiff to pretextual and irregular "processes" and investigations; (v) disseminating or relying upon false narratives regarding Plaintiff's performance and progress; (vi) taking actions culminating in the termination of Plaintiff's clinical agreement and other adverse changes to the terms and conditions of Plaintiff's employment and contractual relationships; and (vii) terminating Plaintiff's employment with NM and UNMCP.

334.   As a direct and proximate result of this unlawful conduct, Plaintiff has suffered lost compensation, lost research and program resources, reputational harm, and emotional distress damages for which he is entitled to relief to the maximum extent permitted by law.

335.   Plaintiff also is entitled to an award of punitive damages.

60

**FIFTH CAUSE OF ACTION: RETALIATION**
**IN VIOLATION OF 42 U.S.C. § 1981**
**Against Nebraska Medicine, UNMCP, Dr. Gold and Dr. Sweasy**

336.    Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

337.    NM, UNMCP, Dr. Gold and Dr. Sweasy, have retaliated against Plaintiff in violation of 42 U.S.C. § 1981 by, among other retaliatory acts, terminating Plaintiff's employment with NM and UNMCP and interfering with Plaintiff's compensation and economic benefits, including refusing to pay full compensation starting in March 2026.

338.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered lost compensation, lost research and program resources, reputational harm, and emotional distress damages for which he is entitled to relief to the maximum extent permitted by law.

339.    Plaintiff also is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION: RACE DISCRIMINATION**
**IN VIOLATION OF NEBRASKA STATUTE § 20-148**
**Against NM, UNMCP and Dr. Sweasy**

340.    Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

341.    Plaintiff is a member of a protected class (race, ethnicity, national origin), including being of East Asian descent.

342.    Nebraska Statute § 20-148 provides for a civil action against persons or companies who deprive others of rights, privileges or immunities guaranteed by the laws of the state of Nebraska and/or the United States Constitution, including the right to be free from discrimination in employment and contract.

61

343.    Through the acts and omissions alleged in this Complaint, NM, UNMCP and Dr. Sweasy intentionally discriminated against Plaintiff because of his race, ethnicity and national origin by, among other things: (i) undermining Plaintiff's leadership role and authority; (ii) obstructing and diverting resources and funding promised for Plaintiff's program; (iii) excluding Plaintiff from clinical leadership functions and restricting clinic participation; (iv) subjecting Plaintiff to pretextual and irregular "processes" and investigations; (v) disseminating or relying upon false narratives regarding Plaintiff's performance and progress; (vi) taking actions culminating in the termination of Plaintiff's clinical agreement and other adverse changes to the terms and conditions of Plaintiff's employment and contractual relationships; and (vii) terminating Plaintiff's employment with NM and UNMCP.

344.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered damages, including but not limited to lost compensation and benefits, loss of contractual and professional opportunities, reputational harm, emotional distress, and other consequential damages, in an amount to be proven at trial.

345.    Plaintiff also is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION: RETALIATION**
**IN VIOLATION OF NEBRASKA STATUTE § 20-148**
**Against NM, UNMC, Dr. Gold and Dr. Sweasy**

346.    Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

347.    Nebraska Statute § 20-148 provides for a civil action against persons or companies who deprive others of rights, privileges or immunities guaranteed by the laws of the state of Nebraska and/or the United States Constitution, including the right to be free from unlawful retaliation.

348.     Plaintiff engaged in protected activity by, *inter alia*, opposing race discrimination, reporting discriminatory conduct and patterns targeting East Asian scientists, and asserting his contractual and economic rights to make and enforce contracts and to the benefits of his employment and endowed/director funds without racial discrimination.

349.     NM, UNMCP, Dr. Gold and Dr. Sweasy retaliated against Plaintiff in violation of Nebraska Statute § 20-148 by, among other retaliatory acts, terminating Plaintiff's employment with NM and UNMCP and interfering with Plaintiff's compensation and economic benefits, including refusing to pay full compensation starting in March 2026.

350.     As a direct and proximate result of this unlawful conduct, Plaintiff has suffered damages, including but not limited to lost compensation and benefits, loss of contractual and professional opportunities, reputational harm, emotional distress, and other consequential damages, in an amount to be proven at trial.

351.     Plaintiff also is entitled to an award of punitive damages.

### EIGHTH CAUSE OF ACTION: WHISTLEBLOWER RETALIATION IN VIOLATION OF PUBLIC POLICY
**Against NM, UNMCP, Dr. Gold and Dr. Sweasy**

352.     Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

353.     Plaintiff engaged in protected activity by reporting instances of, among other things, discrimination, malpractice and patient safety issues, misuses of state and endowed funds, facilities kickbacks and IT and cybersecurity failures to Defendants.

354.     NM, UNMCP, Dr. Gold and Dr. Sweasy thereafter took materially adverse actions against Plaintiff that were causally connected to his protected activity, including, among other

63

things, defaming Plaintiff, removing Plaintiff from the clinic and terminating the UNMCP Agreement.

355. These actions contravened clear public policies protecting reports of discrimination, fraud, misuse of public funds, medical malpractice and patient-safety concerns.

356. As a direct and proximate result of this unlawful conduct, Plaintiff has suffered damages, including but not limited to lost compensation and benefits, loss of contractual and professional opportunities, reputational harm, emotional distress, and other consequential damages, in an amount to be proven at trial.

357. Plaintiff also is entitled to an award of punitive damages.

**NINTH CAUSE OF ACTION: BREACH OF THE**
**COVENANT OF GOOD FAITH AND FAIR DEALING**
**Against UNMCP**

358. Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

359. UNMCP breached the covenant of good faith and fair dealing implied in their agreement with Plaintiff by frustrating Plaintiff's ability to receive the benefits of that agreement through, among other things, defamatory statement, engineered delays, manufactured obstacles, pretextual restrictions, misuse of restricted program funds, termination and compensation reductions.

360. These examples are far from an exhaustive list of ways in which UNMCP breached the implied covenant of good faith and fair dealing.

361. By these actions, UNMCP intentionally interfered with Plaintiff's contractual rights and deprived Plaintiff of the fruits of the parties' agreements.

362.    As a direct and proximate result of UNMCP's breaches, Plaintiff has suffered lost compensation, lost research and program resources, reputational harm, and emotional distress damages for which he is entitled to relief to the maximum extent permitted by law.

## TENTH CAUSE OF ACTION: TORTIOUS INTERFERENCE
## WITH CONTRACT AND BUSINESS EXPECTANCY
### Against NM, UNMCP, Dr. Gold and Dr. Sweasy

363.    Plaintiff hereby repeats and realleges all prior allegations and incorporates them herein.

364.    NM, UNMCP, Dr. Gold and Dr. Sweasy intentionally and improperly interfered with Plaintiff's contractual relations and prospective economic relationships, causing termination and loss of programmatic, economic, and reputational opportunities.

365.    By way of example only, NM, UNMCP, Dr. Gold and Dr. Sweasy materially tortiously interfered with Plaintiff contracts, by among other things, obstructing Plaintiff's clinical leadership and banning him from the clinic; blocking or delaying critical research equipment and facilities; refusing to market the PCCE; misapplying restricted funds to Plaintiff's salary and other impermissible purposes; failing to pay full compensation owed under the Offer Agreement following termination of the UNMCP Agreement.  NM, UNMCP, Dr. Gold and Dr. Sweasy further blocked, delayed, or conditioned purchases, including a mass spectrometer and other core instruments, refused timely facilities support, and imposed conflicted management fees that increased costs.  Defendants' marketing personnel refused to advertise the PCCE, dismissed NPF designations as pay-to-play, and obstructed proposed campaigns.  Defendants applied state-matched PCCE funds and endowed chair proceeds to pay Plaintiff's salary contrary to the program's restricted purpose and without Plaintiff's approval.  After the January 23, 2026

termination of the UNMCP Agreement effective March 24, 2026, NM, UNMCP, Dr. Gold and Dr. Sweasy refused to pay Plaintiff's full compensation due under the Offer Agreement.

366.  These examples are far from an exhaustive list of ways in which Defendants tortiously interfered with Plaintiff's agreements.

367.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered lost compensation, lost research and program resources, reputational harm, and consequential damages for which he is entitled to relief to the maximum extent permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment be entered in his favor against Defendants, and each of them, as follows:

A.  For a money judgment representing compensatory damages including consequential damages, lost wages, back pay, front pay, earning, and all other sums of money, together with interest on these amounts, according to proof;

B.  For a money judgment for mental pain and anguish and severe emotional distress, according to proof;

C.  For punitive and exemplary damages according to proof;

D.  For attorneys' fees and costs;

E.  For declaratory and injunctive relief;

F.  For reinstatement;

G.  For specific performance;

H.  For prejudgment and post-judgment interest; and

I.  For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  May 26, 2026
       New York, New York

                        Respectfully submitted,

                        **WIGDOR LLP**

                        Michael J. Willemin

                        85 Fifth Avenue, Fifth Floor
                        New York, NY 10003
                        Telephone: (212) 257-6800
                        Facsimile: (212) 257-6845
                        mwillemin@wigdorlaw.com

                        *Attorneys for Plaintiff*